**08CV1927
JUDGE GOTTSCHALL
MAG.JUDGE DENLOW**

**FILED**

APR - 3 2008
Apr 3, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Thomas M. Melton (4999)
Karen L. Martinez (7914)
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel. 801-524-5796

FILED
U.S DISTRICT COURT **RECEIVED CLERK**

2008 MAR 28 A 9: **MAR 2 8 2008**

DISTRICT OF UTAH **U.S. DISTRICT COURT**

BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

---

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

v.

MADISON REAL ESTATE GROUP, LLC, a Wyoming
limited liability company, RICHARD AMES HIGGINS,
BRANDON S. HIGGINS, and ALLAN D.
CHRISTENSEN,

DEFENDANTS.

---

**ORDER
APPOINTING A
RECEIVER**

Civil No.

Case: 2:08cv00243
Assigned To : Kimball, Dale A.
Assign. Date : 3/28/2008
Description: Securities and Exchange
Commision v. Madison Real Estate
Group et al

WHEREAS this matter came before the Court upon motion of the Plaintiff

Securities and Exchange Commission ("Commission") to appoint a receiver for the

purpose of marshalling and preserving assets in the above-captioned action; and

WHEREAS the Court has entered a Temporary Restraining Order against

defendants Richard Ames Higgins, Brandon S. Higgins, Allan D. Christensen and

Madison Real Estate Group, LLC (collectively, the "Defendants"); and

WHEREAS the Court has entered an Order freezing the assets of Richard Ames

Higgins, Brandon S. Higgins and Madison Real Estate Group, LLC, Gallatin Group, LC,

Castlerock Investments, LLC and Qwest Management, LLC together with the assets of

all affiliated limited partnerships, including but not limited to Oklahoma Overlake LP,

Texas Lubbock Square LP, Westgate San Angelo LP, Lubbock Preserve at Prairie Pt. LP, Oklahoma Sunnyview LP, San Angelo Casa Rio LP, Baytown Crosby Green LP, Abilene Spanish Arms LP, Town Plaza Lubbock LP, San Angelo Greystone LP, Wellington Texas LP, Oklahoma Oakridge Village LP, Lubbock Riviera LP, Coronado Hills Big Spring LP, Abilene Meridian LP, Lubbock Treehouse LP and Lubbock Aspen Village LP (collectively, the "Limited Partnerships"); and

WHEREAS the assets that have been frozen are in danger of having their value reduced by the passage of time, and it is appropriate that the assets be marshaled and an accounting provided to the Court; and

WHEREAS, this Court has jurisdiction over the subject matter of this action and Defendants, and venue properly lies in this district.

**NOW THEREFORE:**

**I.**

**IT IS HEREBY ORDERED** that, pending the determination of the Commission's action on the merits, or such other time as the Court may order, Roger McConckie of Prince Yeates & Geldzahler be appointed Receiver ("the Receiver") of the Defendant Madison Real Estate Group, LLC, the above-named Limited Partnerships and all subsidiaries and affiliated entities (collectively, the "Companies"). The Receiver shall take control of the Companies' funds, assets and property wherever situated, with the powers set forth herein, including powers over all funds, assets, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, and other property belonging to or in the possession of or control of the Companies, and the Receiver is hereby authorized, empowered, and directed:

a.    to have access to, to marshal and take control of all funds, assets, premises (whether owned, leased, occupied or otherwise controlled), choses in action, papers, books, records in whatever media, and other property, wherever located, belonging to, in

the custody, control or possession of the Companies, with full power to take such steps as he deems necessary to secure such premises, funds and property;

      b.      to have control of, and to close, transfer or otherwise take possession of all accounts, securities, funds, or other assets of, or in the name of the Companies at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds of the Companies, or of any assets deposited by customers or clients with the Companies, or into an account in the name of the Companies, or held in trust or deposited with the Companies or its agents or trustees, wherever situated;

      c.      to take such action as is necessary and appropriate to preserve and take control of, and to prevent the dissipation, concealment, or disposition of any assets in the possession, custody, name, or control of the Companies;

      d.      to hold in his possession, custody and control all assets, securities, monies and property, together with all profits, dividends, interest or other income attributable thereto, of whatever kind deposited by the Companies, with the Companies, or into an account in the name of the Companies, pending further order of this Court;

      e.      to make or authorize such payments and disbursements from the funds and assets under his control pursuant to this Order, and to incur, or authorize the incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary and advisable in discharging his duties as Receiver;

      f.      to engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers.

      g.      to take possession, have access to, and to review all mail or any other communication, in any form, of the Companies or of its agents, officers and directors;

      h.      to take any action which he deems to be necessary and appropriate in order to cause the Companies to file a bankruptcy petition under any chapter of Title 11

of the United States Code, including the execution of all necessary corporate resolutions or directions. The Defendants or any other person affiliated with the Companies or purporting to act on behalf of the Companies may not file a bankruptcy petition under any chapter of Title 11 of the United States Code on behalf of the Companies or under any analogous law of any other jurisdiction. In the event that a Bankruptcy petition is filed on behalf of the Companies, the bankruptcy reference shall be withdrawn with regard to payment of fees and expenses of the Receiver, his attorneys, accountants, consultants and any other person or entity hired to assist the Receiver in the execution of his duties pursuant to this Order, and this Court shall retain jurisdiction over the payment of such fees and expenses;

  i.     to make demand, file or otherwise handle any claim under any insurance policy held by or issued on behalf of the Companies, its officers, directors, agents, employees, trustees or other persons affiliated with the Companies and to take any and all appropriate steps in connection with such policies.

## II.

**IT IS HEREBY FURTHER ORDERED** that, in connection with the appointment of the Receiver provided for above:

  a.     The Companies and all officers, agents, servants, employees, attorneys-in-fact, shareholders, consultants, accountants, advisers, counsel and other persons, and Defendants in this action, who are in custody, possession, or control of any customer or client information, assets, books, records, or other property belonging to or in the custody or control of the Companies shall forthwith give access to and control of such property to the Receiver, and shall forthwith grant to the Receiver, or such other person whom the Receiver may designate, authorization to be the signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets or funds in the name of or for the benefit of the Companies.

4

b.    The Receiver is authorized, empowered, and directed without further leave of the Court, to liquidate and convert into money all of the assets, property, estate, effects and interests of every nature held in his possession and control pursuant to this Order, by selling, conveying, and disposing of the property, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the persons or parties entitled to the proceeds, and with due regard to the realization of their true and proper value and to deposit such proceeds into an account, pending further order of the Court.

c.    The Receiver is authorized to invest any and all money or proceeds in his possession and control in United States Treasury instruments or in a money market account that invests solely in United States Treasury instruments.

d.    All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of or for the benefit of the Companies shall cooperate expeditiously in the transfer of funds, other assets and accounts to the Receiver or at the direction of the Receiver.

e.    All banks, brokers, dealers, depositories or any other financial institutions shall not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Companies except upon instructions from the Receiver or his designees.

f.    The Receiver shall have the authority to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure.

g.    Defendants and their respective officers, agents, servants, employees, and attorneys-in-fact, consultants, accountants, advisers and counsel shall cooperate with and assist the Receiver, including, if deemed necessary by the Receiver, by appearing for deposition testimony and producing documents, and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver in the conduct of his duties or to interfere in any manner, directly or indirectly, with the custody,

5

possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above.

h.     The costs, fees and expenses of the Receiver incurred in connection with the performance of his duties described herein, including the costs and expenses of those persons who may be engaged or employed by the Receiver to assist him in carrying out his duties and obligations hereunder shall be paid out of the proceeds or other assets of the Companies, or any and all assets under the control of the Receiver pursuant to this Order. All applications for costs, fees and expenses for services rendered in connection with the Receiver shall be made by application setting forth in reasonable detail the nature of the services and shall be heard by the Court. The court-appointed receiver shall submit his fee application to counsel for the Commission for review at least ten (10) days prior to filing the application this the Court.

i.     No bond shall be required in connection with the appointment of the Receiver. The Receiver and all other persons who may be engaged or employed by the Receiver to assist him in carrying out his duties and obligations hereunder shall not be liable for any act or omission of the Receiver or such person, respectively, or any of their partners, employees, or agents, unless it shall be proven that the Receiver or such other person acted or omitted to act willfully and in bad faith. This provision shall apply to claims based on conduct of the Receiver and all other persons who may be engaged or employed by the Receiver hereunder during the term of the appointment by this Court, even if such claims are filed after the termination of any such appointment.

### III.

**IT IS HEREBY FURTHER ORDERED** that, pending the determination of the Commission's action on the merits, representatives of the Receiver are authorized to have continuing access to inspect or copy any or all of the corporate books and records and other documents of the Companies, including records relating to any accounts maintained by or in the name of the Companies at a broker, dealer, financial institution, depository

6

institution or any other entity, or of accounts maintained on behalf of the Companies'
customers or clients that have transferred, transmitted or otherwise delivered any
securities, monies, or property of any kind, to the Companies, and continuing access to
inspect the Companies funds, property and assets, including customer or client accounts,
wherever they may be located.

### IV.

**IT IS HEREBY FURTHER ORDERED** that, in addition to the powers, duties
and responsibilities as set forth herein, the Receiver shall be authorized, empowered and
directed to investigate, prosecute, defend, intervene in or otherwise participate in,
compromise, and adjust actions in any state, federal or foreign court or proceeding of any
kind as may in his sole discretion be advisable or proper to recover or conserve funds,
assets and property of the Companies.

### V.

**IT IS HEREBY FURTHER ORDERED** that the Companies and its officers,
directors, employees, agents and counsel shall transfer to the Receiver, as and when
directed by him, any and all funds, property, documents or records of the Companies, in
whatever form, that may be in their possession, custody or control; and that any
signatories on any and all the Companies' accounts at banks, brokerage firms or financial
institutions which have possession, custody or control of any assets or funds in the name
of or for the benefit of the Companies, shall forthwith take all steps necessary to
relinquish their signatory authority as to said accounts including, but not limited to,
accounts containing securities or other assets that the Companies' customers have
transferred, transmitted or otherwise delivered to the Companies.

7

## VI.

**IT IS FURTHER ORDERED** that this Order shall remain in effect and shall

supplement all prior Orders of this Court until further Order of this Court. The Court

shall retain jurisdiction of this matter for all purposes.

Dated this 28th day of March 2008.



UNITED STATES DISTRICT JUDGE

I hereby certify that the annexed is a true and correct
copy of a document or an electronic docket entry on
file at the United States District court for the District
of Utah.

\# of pages 8
Date: 4-2-08

D. MARK JONES, Clerk
By
    Deputy Clerk

Karen L. Martinez (7914)
Thomas M. Melton (4999)
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel.  801-524-5796

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

MAR 28 2008

D. MARK JONES, CLERK

BY_____
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

v.

MADISON REAL ESTATE GROUP, LLC, a Wyoming
limited liability company, RICHARD AMES HIGGINS,
BRANDON S. HIGGINS, and ALLAN D.
CHRISTENSEN,

DEFENDANTS.

**COMPLAINT**

Case: 2:08cv00243
Assigned To : Kimball, Dale A.
Assign. Date : 3/28/2008
Description: Securities and Exchange
Commision v. Madison Real Estate
Group et al

Plaintiff, Securities and Exchange Commission (the "Commission"), for its

Complaint against Defendants alleges as follows:

### INTRODUCTION

1. This matter involves an ongoing offer and sale of unregistered securities by

   Madison Real Estate Group, LLC ("Madison") and its principals Richard

   Higgins ("Higgins"), Brandon Higgins ("Brandon") and Allan Christensen

   ("Christensen") which has raised at least $15 million from over 40 investors.

2. Madison markets itself as a family owned limited liability company with over

   30 years of experience in successful real estate investments.

3.   According to its representatives, Madison focuses on purchasing C grade apartment buildings at below fair market value, upgrading those buildings, and then selling the buildings for a profit. Madison claims to generate revenues from its real estate investments that exceed $100 million each quarter.

4.   Higgins and Christensen solicited investors to invest with Madison, guaranteeing a 1% per month return on the investment and quarterly bonuses based on the performance of the apartment buildings Madison purchased.

5.   Contrary to the representations made to investors, Madison does not have 30 years of real estate investment experience and does not generate millions of dollars in revenue.

6.   Madison sold the apartment buildings to the investors at prices above fair market value and in excess of the price paid by Madison.

7.   Instead of paying investors with the operating profits from the apartment buildings, Higgins, Christensen, and Brandon allowed the apartment buildings to fall into disrepair, neglected to pay mortgages, owed hundreds of thousands of dollars to vendors who provided goods and services to the buildings and simply used rental revenue or funds received from subsequent investors to pay the guaranteed 1% per month to investors.

8.   All the buildings Madison purchased are on the verge of foreclosure, in dire need of maintenance, and have substantial trade debt associated with them.

9.   Higgins, Brandon, and Christensen also failed to inform investors that Higgins had previously been enjoined by the Commission, had been disbarred by the Utah State Bar and is a convicted felon.

### JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and

2

77v] and Sections 21 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

11.    Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

12.    Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because certain of the defendants reside in and transact business in this district.

13.    Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and course of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

14.    Defendants conduct took place in connection with the offer, purchase and/or sale of Madison securities in the form of limited partnership interests or tenant in common interests ("TIC investments"). The interests sold by Madison, Higgins and Christensen are securities, and no registration statement has been filed with respect to the offering of these interests.

## DEFENDANTS

15.    **Madison Real Estate Group, LLC** ("Madison") is a Wyoming limited liability company with its principal place of business in Midvale, Utah. Madison claims to be a family owned limited liability company with over 30 years experience in commercial real estate. Brandon controls Madison's bank

accounts and executes most documents on Madison's behalf; however, Higgins and Christensen actually control the company.

16. **Richard Ames Higgins**, age 60, is a Utah resident currently incarcerated at the Utah State Prison in Draper, Utah. While on parole, Higgins controlled Madison and solicited investors on its behalf. In August 2006, Higgins was enjoined from future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by the United States District Court for the District of Utah in SEC v. Marino, et al, 2:99 CV 258G, a prime bank Ponzi scheme.

17. **Brandon S. Higgins**, age 30, is a resident of Salt Lake City, Utah. Brandon is Higgins' son. Brandon controls Madison's bank accounts from which he disperses the monthly profits from the apartment buildings to investors. Brandon also provides quarterly reports on each building to investors and executes all documents on Madison's behalf. Brandon is also a licensed real estate agent with the state of Utah.

18. **Allan D. Christensen**, age 39, is a resident of Salem, Utah. Christensen is a co-owner of Madison with Higgins and a co-owner of Qwest Management, LLC. Christensen has solicited investors on behalf of Madison and has also received management fees from the various Madison properties through Qwest Management, LLC.

## BACKGROUND

19. Beginning in early 2006 and continuing through the present, Madison, through Higgins and Christensen, sold securities primarily in the form of limited liability partnerships to approximately 42 investors in unregistered transactions, raising at least $15 million.

20. A few investors were tenants in common ("TIC investors") with Madison in certain properties. These investors entered into a Section 1031 exchange

4

whereby they sold other investment properties and used the profits from those sales to invest in a particular building with Madison. In substance these investments functioned in the same manner as the limited partnerships.

21. Madison markets itself as a family owned limited liability company with over 30 years of experience in the commercial real estate business.

22. Madison ostensibly focuses on purchasing C grade apartment buildings for below fair market value, upgrading the units, and selling the buildings at a profit.

23. According to Higgins and Christensen, the buildings generate sufficient profits to pay a guaranteed return of 1% per month to investors.

24. Higgins and Christensen told investors Madison purchased the buildings at below fair market value and, as a result, after the improvements it made, the buildings could be sold one to two years later generating an over 30% return for investors.

## RECRUITING INVESTORS

25. Higgins and Christensen located investors by acting as mentors for National Real Estate Investors, LC ("NRI"), a company that offers real estate investing seminars throughout the United States. NRI advertised its educational seminars on its website.

26. Most of Madison's investors attended a one day NRI real estate investing seminar. During the one day NRI seminars, NRI offered attendees the opportunity to purchase additional real estate investment education that included one-on-one mentoring sessions by experienced real estate investing experts.

27. Madison investors paid NRI between $3,000 and $25,000 for additional real estate investing seminars and twelve one-on-one mentoring sessions. Higgins

or Christensen was the NRI mentor assigned to the individuals who eventually became Madison investors.

28. Higgins or Christensen held weekly telephonic mentoring sessions with each Madison investor. During the calls, Higgins and Christensen discussed various aspects of real estate investing.

29. Toward the end of the mentoring sessions, Higgins and Christensen offered investors the opportunity to invest with Madison.

30. Higgins and Christensen told investors that Madison is a family-run business and that they are providing a limited number of opportunities to invest with the company. Higgins and Christensen claimed this was a "friends and family" only opportunity.

31. Higgins and Christensen explained to investors that Madison purchases apartment buildings at below fair market value, renovates the buildings, then sells the buildings in one to two years realizing profits of 30% or more.

32. Higgins and Christensen told investors that they would receive a guaranteed 1% per month return on their investment to be paid from the operating profits of the buildings they purchase. Investors were told they would also receive a quarterly bonus based on the performance of the buildings.

33. Higgins and Christensen claim that Madison performs thorough due diligence on the apartment buildings it purchases. Because Madison exercised such care in researching the buildings it purchases, it is able to buy buildings at below fair market value and generate high returns for investors.

34. Higgins and Christensen provided investors with a fact sheet for each building. The fact sheets set forth the due diligence allegedly performed by Madison, the occupancy rates of each building, the amounts each investor was to contribute to each building, and the purported purchase price of each building.

6

35.    Investors receive instruction from Higgins and Christensen to transfer their
funds to the Madison account at Zions First National Bank in Salt Lake City.
Higgins, Christensen and Brandon are the signatories on that account.

36.    After the buildings are purchased, Madison creates a limited partnership for
each building in which it allocates a limited partnership interest to each
investor based on the amount invested. Madison acts as the general partner in
each of the limited partnerships.

37.    Madison sets up bank accounts at various financial institutions for each
building to collect rental income and pay expenses associated with each
building. However, when necessary, Madison pays expenses for one building
from the account of another building.

38.    Investors are not offered a choice of which building to invest in. Madison
locates the buildings, performs all the due diligence, and manages the
buildings. Investors are not provided copies of any due diligence materials or
closing documents. Madison claims that this information is a trade secret or
too voluminous to provide to investors.

39.    Investors understood from Higgins and Christensen that Madison would
perform certain upgrades to the buildings which would result in substantial
increases in the properties' values. The buildings would then be sold within
one to two years generating additional profits for investors.

40.    Investors receive monthly reports from Madison for each building along with
their monthly 1% guaranteed return. The monthly reports detail putative
upgrades Madison claims it is making on each property. Madison also
provides quarterly reports which describe putative work being performed on
the buildings and include the quarterly bonus payments that Higgins and
Christensen claim came from the operating profits of the building. The

monthly and quarterly reports are signed by Brandon. These timely payments have induced investors to make additional investments with Madison.

41.    According to Higgins, Madison generates revenues of $100,000,000 per quarter and has had income of $250,000 per month.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS

42.    Higgins explained to investors that Madison has become so successful that he left his practice as an international attorney to focus on managing Madison's investments. Higgins has failed to inform investors that he had lost his license to practice law resulting from a state criminal conviction for securities fraud. Higgins served five years for the three felony counts of state securities laws violations and was released from prison on March 5, 2005.

43.    During the time Higgins was soliciting investments for Madison, Higgins was on parole. The terms of Higgins parole forbade him from handling others' money for any purpose or from operating his own business. As a result of his parole violations, Higgins parole has been revoked and he is currently incarcerated at the Utah State Prison.

44.    Higgins has neglected to tell investors that he had been convicted of securities fraud. Higgins also did not inform investors that he had previously been enjoined by the Securities and Exchange Commission from violations of the federal securities laws.

45.    Although Christensen knew of Higgins criminal background, he has not informed investors of his partner's past securities laws violations, criminal conviction, or that Higgins had lost his license to practice law.

46.    The omissions regarding Higgins' background were material to investors.

47.    Investors received quarterly and monthly reports along with the guaranteed 1% per month return and quarterly bonuses through October 2007.

48.    Less than one week after receiving their last bonus payments in October 2007, investors began receiving calls from the lenders on the buildings indicating that Madison had failed to pay the mortgages and the buildings were several months in arrears.

49.    Upon learning that Madison had not made the mortgage payments, investors contacted the on site building managers and learned that Madison had also failed to pay vendors who provided goods and/or services to the buildings and that hundreds of thousands of dollars was due to various vendors. Some vendors had filed mechanics liens on the properties.

50.    The investors confronted Higgins and Christensen regarding the past due mortgage payments and the failure to pay vendors. Higgins and Christensen admitted they had "goofed" and were in over their heads.

51.    Higgins prepared a spreadsheet for investors detailing how far behind each building was in its mortgage payments and the monthly shortfall each building experienced. Based on the information provided by Higgins it became clear to the investors that the returns and bonuses they received had not come from operating profits of the buildings, since most if not all of the buildings were actually operating at a loss.

52.    The misrepresentations and omissions regarding the profitability of the buildings were material to investors.

53.    Contrary to Higgins' and Christensen's representations, investors paid more than fair market value for the buildings.

54.    Higgins provided a handwritten document to investors that revealed for the first time that Madison had paid less for the properties than represented to investors in the documents provided to investors at the time they made their investment.

9

55. Higgins' notes and closing documents later obtained by investors demonstrate that Madison purchased the properties from third parties, and marked up the purchase price substantially before selling the properties to investors.

56. Closing documents further disclosed that Christensen received previously undisclosed commissions or referral fees from those transactions.

57. Higgins', Christensen's and Brandon's failure to disclose Madison's markups in the purchase prices of the buildings and the commissions or referral fees received by Christensen was material to investors.

58. After learning the details of the unpaid mortgages and trade debt associated with the buildings, investors made on-site visits to many of Madison's buildings. During the visits, the investors discovered that occupancy rates at the buildings were far less than represented by Madison. In fact, one building had only one or two tenants.

59. The buildings were in a state of disrepair, roofs and foundations leaked, apartments were uninhabitable, littered and in at least one case contained dead animals.

60. Madison's misrepresentations and omissions regarding the condition of the buildings were material.

61. Investors also reviewed the bank accounts of each of the buildings and discovered that Madison had been transferring funds from one building's account to another using rental deposits from one building to pay expenses associated with another building.

62. Although they had access to the bank accounts, Higgins, Christensen and Brandon failed to disclose this commingling of funds.

63. The commingling of fund was material to investors.

64. The bank records further revealed that Christensen withdrew substantial amounts from the accounts as Qwest's management fees for each of the

buildings. Christensen took those fees despite the fact that he had failed to make the mortgage payments, had not performed repairs on maintenance, and allowed significant trade debt to accumulate on each of the buildings.

65.  Higgins and Christensen had not disclosed to investors that they would pay themselves management fees.

66.  Christensen's and Higgins' omission regarding the management fees received by Qwest was material to investors.

67.  Madison's bank statements further reflect that Higgins used the account into which investors had transferred funds as a personal piggy bank, withdrawing money to pay for family vacations, four wheelers and other personal expenses.

68.  Investors would not have made subsequent investments with Madison if the actual profits or losses made by each building had been reported to them by Madison. Instead, investors received glowing reports regarding the operations of the buildings from Higgins and Christensen and received monthly profit statements from Brandon.

69.  Despite Higgins claim that Madison generated $100,000,000 per quarter and had a monthly income of $250,000, Higgins and Christensen admitted to investors that they have no funds to contribute to the back mortgage payments, outstanding bills from vendors or the needed repairs to the buildings.

## DEFENDANTS ACTED WITH SCIENTER

70.  Higgins, Christensen and Brandon acted with scienter.

71.  Higgins knew about his criminal conviction, prior Commission injunction, and disciplinary history with the Utah State Bar. Christensen and Brandon admitted to investors that they also knew about Higgins background but did not disclose that information to investors.

72.    Higgins and Christensen located the buildings and were responsible for the buildings' management. Both knew that the purchase prices of the buildings were marked up before the sales to investors because they received cash from the closings. Christensen and Brandon executed closing documents on behalf of Madison.

73.    Higgins prepared a handwritten document for investors detailing the undisclosed markups in the purchase prices for the buildings demonstrating that he knew the prices had been inflated.

74.    Higgins, Christensen and Brandon were signatories on the Madison bank accounts. A review of that account discloses the personal expenditures from that account.

75.    Brandon signed the monthly and quarterly reports provided to investors that induced investors to make additional investment with Madison. Brandon either knew that the mortgages had not been paid and that vendors were owed substantial sums or he was reckless in not knowing. A review of the bank records would have revealed the fact that payments had not been made.

76.    Christensen controlled the bank accounts for the various buildings. As a result, he knew that the mortgages had not been paid and that vendors' bills were piling up. He also knew that Madison used funds from one building to pay expenses associated with another.

## FIRST CAUSE OF ACTION
## EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

77.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 76, above.

78.    Defendants Madison, Higgins, Brandon, and Christensen, and each of them, by engaging in conduct described in Paragraphs 1 though 76, above, directly

or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

79.    By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### SECOND CAUSE OF ACTION
### FRAUD IN THE OFFER AND SALE OF SECURITIES
### Violations of Section 17(a)(2) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (3)]

80.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 76, above.

81.    Defendants Madison, Higgins, Brandon, and Christensen, and each of them, by engaging in the conduct described in Paragraphs 1 through 76, above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

82.    By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to

violate, Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### THIRD CAUSE OF ACTION
### FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

83.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 76, above.

84.   Defendants Madison, Higgins, Brandon, and Christensen, and each of them, by engaging in the conduct described in Paragraphs 1 through 76, above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

85.   By reason of the foregoing, Defendants, and each of them, violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

### II

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily restrain, and preliminarily and permanently enjoin, Defendants Madison, Higgins, Christensen and Brandon, and their officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 17(a) of the Securities Act and Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily and permanently enjoin Defendants, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from:  (A) transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of these Defendants; (B) transferring, assigning, selling, hypothecating, or otherwise disposing of any assets of Madison; and (C) appointing a receiver over Defendant Madison, as well as all other entities directly or indirectly controlled by Higgins, Christensen or Brandon which have received investor funds.

**IV**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminary and permanently restrain and enjoin Defendants, and each of them, and their officers agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, books, records, computer programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard-copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of the Defendants.

**V**

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

**VI**

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

**VII**

Grant such further equitable relief as this Court deems just, appropriate, and necessary, including, but not limited to, a freeze of assets and the acceleration of discovery, including the forthwith production of documents.

**VIII**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 27th day of March 2008.

Respectfully submitted,

Karen L. Martinez
Thomas M. Melton
Attorneys for Plaintiff
Securities and Exchange Commission

17